**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

MATTHEW T. LANGENBERG, M.D.,  )
                                    )
               Plaintiff,        )     Case No. 1:12-cv-175-NBF
    v.                          )
                                      )
WARREN GENERAL HOSPITAL,     )
*et al.*,                               )
               Defendants.    )

## <u>MEMORANDUM OPINION</u>

This civil action was filed by Plaintiff Matthew T. Langenberg, M.D., a vascular surgeon,

following his loss of employment and clinical privileges at Warren General Hospital.  The

named Defendants are Warren General Hospital (hereafter, "Defendant Hospital" or the

"Hospital") and its CEO, John P. Papalia, FACHE ("Papalia").  This Court's jurisdiction is

premised on 28 U.S.C. §1332.  Presently pending before the Court is Defendants' Motion to

Dismiss Plaintiff's Second Amended Complaint (Docket No. 34).  For the reasons that follow,

Defendants' motion will be granted with respect to Counts 1, 2, 3, and 9 as well as Plaintiff's

request for attorney fees.

## I.   FACTUAL BACKGROUND

Plaintiff is a Vascular Surgeon and Endovascular Specialist formerly associated with

Vascular Medicine & Surgical Associates, L.L.P., in Youngstown, Ohio.  (Second Amended

Complaint "SAC" [Docket No. 27] ¶¶ 7-8.)  Between April and June of 2011, Defendant

Hospital actively recruited Plaintiff to join its medical staff in order to help establish a vascular

program and assist with general surgery.  (Id. at ¶ 9.)  To that end, Defendants repeatedly assured

Plaintiff that they would acquire a new Cardiac Catheterization ("Cath") Lab for his use and would develop a robust vascular practice. (Id. at ¶ 10.)

On or about June 7, 2011, Plaintiff entered into a Physician Employment Agreement ("Employment Agreement") with the Hospital in which he agreed to provide professional medical services to patients for a five-year period. (SAC ¶ 12; SAC Ex. A [Docket No. 27-1] at ¶ 3(a).) One condition of the Employment Agreement was that Plaintiff obtain medical staff privileges at the Hospital. (Id.) Plaintiff did so and commenced his employment at the Hospital on or about August 1, 2011. (SAC ¶¶ 13-14.) In terminating his practice in Youngstown and accepting employment at Defendant Hospital, Plaintiff relied upon the Hospital's promises and representations concerning the establishment of a Cath Lab. (Id. at ¶¶ 11, 13.)

Plaintiff's relationship with the Hospital was governed not only by the Employment Agreement but also by the Bylaws of the Medical Staff of Warren General Hospital (the "Bylaws"). (SAC ¶ 15.) The Bylaws contain, among other things, provisions governing the termination of medical staff membership and clinical privileges at the Hospital, including two methods by which clinical privileges may be forfeited. (SAC ¶ 16.)

First, pursuant to Article XIV, Section IV(A)(1), "[t]he Membership and clinical privileges of any practitioner who has a contractual relationship with the Hospital … shall terminate automatically and immediately upon … the expiration or other termination of the contractual relationship with the Hospital…." (SAC ¶ 17; SAC Ex. B [Docket No. 27-2] at Article XIV, § IV(A)(1).) The Bylaws specifically state that "[t]he termination of Membership or clinical privileges under [the foregoing provision] shall not be deemed to be an adverse action." (SAC at ¶ 17; SAC Ex. B at Article XIV, § IV(A).)

Second, pursuant to Article XVI of the Bylaws, staff membership and clinical privileges may be terminated pursuant to a disciplinary process whereby the physician is entitled to a hearing and certain due process rights. (SAC at ¶ 18; SAC Ex. B at Article XVI.) The Second Amended Complaint summarizes this process as follows:

> Whenever the Hospital's Medical Executive Committee considers a request to discipline a practitioner, or to reduce, suspend or revoke his medical staff appointment or clinical privileges, such a request must be reviewed by an ad hoc committee that is appointed by the chairperson of the practitioner's department. Article XVI, Section I-III. This ad hoc committee must "inform the practitioner of the general nature of the charges against him or her, and shall provide an opportunity for the practitioner to be interviewed by the committee and to make a statement on his/her own behalf. *Id.*, Section III(B).
>
> [ ] The ad hoc committee's findings then must be forwarded to the Medical Executive Committee for determination of any disciplinary action. *Id.,* Section IV. If the Medical Executive Committee recommends a reduction, suspension or revocation of the practitioner's clinical privileges or medical staff appointment, it may forward such recommendation to the hospital's Board of Directors, but "only … in accordance with the terms of the Fair Hearing Plan." *Id.*
>
> [ ] The [Bylaws'] Fair Hearing Plan establishes a detailed set of procedures to ensure that a practitioner is notified of the accusations against him and has multiple opportunities to contest any assertions that affect his ability to maintain membership and privileges, including appellate review of any adverse recommendation. *See* Bylaws, Exhibit A, Sections I-XI.

(SAC ¶¶ 18-20.)

After several months of practicing at Defendant Hospital, Plaintiff became concerned about the quality of its clinical operations. On or about December 6, 2011, he presented to the Hospital's Chief of Clinical Operations a list of forty "patient safety and standard of care" concerns. (SAC ¶ 21; SAC Ex. C [filed at Docket No. 32)].) That same month Plaintiff advised hospital officials of problems he was experiencing scheduling vascular cases and operating room time as well as concerns he had regarding the persistent lack of endovascular supplies. (SAC ¶¶ 22-23.) In January of 2012, Plaintiff advised the Director of the Operating Room of concerns he

3

had about supplies, medication errors, and lack of employee professionalism. (Id. at ¶ 24.) On January 25, he requested that the Chief of Clinical Operations address the issues previously raised concerning patient safety. (Id. at ¶ 25.)

Instead of receiving a response to these requests, Plaintiff received a letter terminating his employment with Defendant Hospital. (SAC ¶ 26.) By letter dated January 26, 2012 and signed by Defendant Papalia, the Hospital advised Plaintiff of its decision to terminate his employment "pursuant to Section 8(a)(i) of the [Employment] Agreement on a non-cause basis, effective immediately." (Id.; SAC Ex. D [Docket No. 27-4].)[1]

Approximately one month later, the Hospital filed a report (the "Adverse Action Report") with the National Practitioner Data Bank ("NPDB" or "Data Bank")[2] stating that Plaintiff had been terminated because, *inter alia,* he "often lacked civility and was demeaning to Hospital staff," which had a "disruptive and detrimental effect on the Hospital's working environment." (SAC ¶ 31.) According to the Adverse Action Report, the bases for the Hospital's report to the Data Bank were Plaintiff's "failure to comply with corrective action plan," "abusive conduct toward staff" and "disruptive conduct." (Id. at ¶ 32.) However, during the course of his employment with Defendant Hospital, Plaintiff had never been disciplined for any misconduct. (Id. at ¶ 34.) In addition, Plaintiff has never been provided any corrective action plan related to the alleged misconduct. (Id. at ¶ 33.)

---

[1] Section 8(a)(i) of the Employment Agreement provides that the Agreement may be terminated "[b]y either party, without cause or consent, upon ninety day's written notice; provided, however, that Hospital may elect, in its sole discretion, to pay Physician in lieu of notice the base salary Physician would have earned had Physician continued to work during the ninety-day notice period." (SAC Ex. A [Docket No. 27-1] § 8(a)(1.).)

[2] The National Practitioner Data Bank was established by the Secretary of the Department of Health and Human Services under the authority of the Health Care Quality Improvement Act of 1986, as amended, title IV of Public Law 99-660, 42 U.S.C. §§ 11101 *et seq.* (2012), as a means of collecting and releasing "certain information relating to the professional competence and conduct of physicians, dentists, and other health care practitioners." 45 C.F.R. §60.1 (2013).

After being terminated from his employment at Defendant Hospital, Plaintiff sought and was offered employment with Northeast Ohio Vascular Associates, Inc., contingent upon his ability to obtain medical staff privileges at Lake Hospital System, Inc. (SAC ¶ 38.) Lake Hospital System, Inc. subsequently asked Defendant Hospital to provide employment verification for Plaintiff on several occasions but Defendant Hospital refused to do so. (Id. at ¶ 39.) Consequently, Plaintiff was unable to secure medical staff privileges at Lake Hospital System, Inc. and was denied employment by Northeast Ohio Vascular Associates, Inc. (Id. at ¶ 40.)

Following the loss of his employment at Defendant Hospital and the filing of the Adverse Action Report, Plaintiff was unable to secure employment as a vascular surgeon for nearly eleven months and was rejected by at least thirty prospective employers before he finally found employment on or about December 15, 2012. (Id. at ¶¶ 41-42.) In the future, other hospitals in the United States will presumably query the Data Bank and receive a copy of the Adverse Action Report before deciding whether to grant Plaintiff medical staff membership and clinical privileges. (SAC ¶ 37.)

## II. PROCEDURAL HISTORY

This action was commenced on August 2, 2012 and was originally assigned to then U.S. District Judge Sean J. McLaughlin. On March 19, 2013, Plaintiff filed his Second Amended Complaint, which is the operative pleading in this case.

The Second Amended Complaint asserts nine causes of action against the Defendants. Count 1 asserts that the Hospital breached the Bylaws by submitting its Adverse Action Report to the Data Bank in spite of a specific provision in the Bylaws stating that termination of medical staff membership and clinical privileges under the present circumstances "shall not be deemed to

5

be an adverse action." (SAC ¶¶ 44-47.) Count 2 asserts that the Hospital breached the Bylaws by failing to afford Plaintiff any of the due process procedures that were allegedly required to be provided. (Id. at ¶¶ 49-50.) Count 3 asserts that Defendants breached the implied covenant of good faith and fair dealing in the Employment Agreement by filing the Adverse Action Report in bad faith after informing Plaintiff that his termination was "on a non-cause basis" and after denying him any opportunity for a hearing. (Id. at ¶¶ 52-55.) Count 4 asserts that Defendants defamed Plaintiff by falsely reporting to the Data Bank that Plaintiff had been terminated for failure to comply with a corrective action plan and for abusive and disruptive conduct toward staff. (Id. at ¶¶ 57-62.) Count 5 asserts a claim for negligent misrepresentation premised upon the Defendants' false assurances, prior to his acceptance of employment, that they would construct an endovascular surgery suite for his use and practice development. (Id. at ¶¶ 64-68.) Count 6 asserts a claim for tortious interference with existing contractual relationships based upon: (a) Defendants' failure to provide employee verification and/or affiliation status to Lake Hospital System, Inc. and (b) Defendants' allegedly wrongful filing of the Adverse Action Report. (Id. at ¶¶ 70-76.) Counts 7, 8, and 9 assert claims for (respectively) intentional interference with existing and prospective relationships, false light invasion of privacy, and abuse of process. (Id. at ¶¶ 77-89.) Each of these claims is premised on the Defendants' allegedly improper filing of the Adverse Action Report. (Id. at ¶¶ 79, 84 and 88.)

Defendants filed their Motion to Dismiss Plaintiff's Second Amended Complaint (Docket No. 34) on April 19, 2013. The parties filed their initial briefs relative to the instant motion (Docket Nos. 35 and 37) and, thereafter, the matter was transferred to the undersigned on August 27, 2013. The Court held oral argument on September 27, 2013, at which time supplemental briefs were ordered. Plaintiff filed his supplemental brief in opposition to the Defendants'

motion (Docket No. 42) on October 17, 2013.  Defendants filed their supplemental brief in

support of the motion (Docket No. 44) on November 8, 2013.  Thus, the issues raised by

Defendants have been fully joined and are now ripe for disposition.

### III. DISCUSSION

A.  Standard of Review

Defendants have moved to dismiss the Second Amended Complaint for failure to state a

claim upon which relief can be granted.  *See* Fed. R. Civ. P. 12(b)(6).  Accordingly, dismissal of

the challenged claims is appropriate only if, accepting all well-pleaded allegations in the Second

Amended Complaint as true and viewing them in the light most favorable to the Plaintiff, the

claims lack facial plausibility.  *Warren Gen. Hosp. v. Amgen Inc.,* 643 F.3d 77, 84 (3d Cir. 2011)

(*citing Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555-56 (2007)).  Although this Court must

accept the allegations in the complaint as true, "'[it is] not compelled to accept unsupported

conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation.'"

*Morrow v. Balaski,* 719 F.3d 160, 165 (3d Cir. 2013) (*quoting Baraka v. McGreevey*, 481 F.3d

187, 195 (3d Cir.2007)).  Documents that are integral to or explicitly relied upon in the

complaint may be considered by the Court pursuant to Rule 12(b)(6) without converting a

motion to dismiss into one for summary judgment.  *Angstadt v. Midd-West School Dist.,* 377

F.3d 338, 342 (3d Cir. 2004) (citation omitted).  Accordingly, the Court will refer to the

Employment Agreement and the Bylaws extensively throughout its discussion, as those

documents have been appended to the Second Amended Complaint, are incorporated therein by

reference, and are integral to Plaintiff's claims.

B.  The Health Care Quality Improvement Act

Both the Second Amended Complaint and Plaintiff's brief in opposition to the pending motion refer to and rely upon the Health Care Quality Improvement Act of 1986 ("HCQIA"), 42 U.S.C.A. §§ 11101-11152 (West 2013).  Consequently, some preliminary discussion of the Act is warranted.

"In passing the [HCQIA], Congress intended 'to improve the quality of medical care by encouraging physicians to identify and discipline physicians who are incompetent or who engage in unprofessional behavior.'"  *Brader v. Allegheny General Hosp.,* 167 F.3d 832, 839 (3d Cir. 1999) (*quoting* H.R. Rep. No. 903, 99th Cong., 2d Sess. 2 (1986), *reprinted in* 1986 U.S.C.C.A.N. 6287, 6384).  Pursuant to the Act and its implementing regulations, 45 C.F.R. §§60.1-60.22 (2013), health care entities such as hospitals are required to report to the National Practitioner Data Base ("NPDB" or "Data Bank") and the State Board of Medical Examiners whenever they take a "professional review action" that "adversely affects the clinical privileges of a physician for a period longer than 30 days."  42 U.S.C.A. §11133(a)(1)(A); 45 C.F.R. §60.12(a)(1)(i).  The Act requires that a "professional review action" be taken:  (1) in the reasonable belief that the action was in the furtherance of quality health care; (2) after a reasonable effort to obtain the facts of the matter; (3) *after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances;* and (4) in the reasonable belief that the action was warranted by the facts known.  42 U.S.C.A. §11112(a) (emphasis supplied).  The HCQIA establishes statutory standards for what constitutes "adequate notice and hearing."  Id. at §11112(b).  If a "professional review action" satisfies these criteria, the relevant professional reviewing body is generally immune from claims for damages arising from the professional

8

review action, as are those who provided information to the professional review body. Id. at §11111(a). Notice and hearing procedures are not required, and statutory immunity is not forfeited, in cases where "no adverse professional review action [is] taken." Id. at §11112(c)(1)(A). Health care entities that fail substantially to comply with the reporting requirements of the HCQIA run the risk of having their names published in the Federal Register and forfeiting their statutory immunity. Id. at §11111(b).

For purposes of the HCQIA, the term "professional review action" is defined to mean:

an action or recommendation of a professional review body which is taken or made in the conduct of professional review activity, which is based on the competence or professional conduct of an individual physician (which conduct affects or could affect adversely the health or welfare of a patient or patients), and which affects (or may affect) adversely the clinical privileges, or membership in a professional society, of the physician.

42 U.S.C.A. §11151(9). The term "professional review activity" includes a hospital's determination as to whether a physician's clinical privileges or hospital membership should be changed or modified. Id. at §11151(10)(C). The term "adversely affecting" is defined to include "reducing, restricting, suspending, revoking, denying, or failing to renew clinical privileges or membership in a health care entity." Id. at §11151(1). See also 45 C.F.R. §60.3.

C. Analysis

In their motion to dismiss, Defendants assert specific grounds for the dismissal of Counts 1, 2, 3 and 9 as well as Plaintiff's request for attorney fees. In the alternative, they contend that the immunity provision set forth in Article XVII of the Bylaws bars some or all of Plaintiff's claims. The Court will address each of Defendants' arguments in turn.

*1. Defendants' Motion to Dismiss Counts 1 and 2*

Counts 1 and 2 of the Second Amended Complaint are premised upon Defendant Hospital's alleged breach of the Bylaws.[3] Count 1 asserts that the breach occurred when the Hospital submitted its Adverse Action Report to the NPDB despite language in the Bylaws specifically stating that a termination of medical staff membership and clinical privileges under the circumstances presented here "shall not be deemed to be an adverse action." Count 2 asserts that the breach occurred by virtue of the Hospital's filing of the Adverse Action Report without having afforded Plaintiff the due process measures applicable in the "professional review action" context. Defendants move to dismiss these counts on the grounds that the Hospital was not contractually obligated in either respect.

Key to the Court's analysis is Article XIV, Section IV(A) of the Bylaws. This provision states, in relevant part, that "[t]he Membership and clinical privileges of any practitioner who has a contractual relationship with the Hospital … shall terminate automatically and immediately upon: ...termination of the contractual relationship with the Hospital" and *"[t]he termination of Membership or clinical privileges under this Article XIV, Section IV, (A) shall not be deemed to be an adverse action."* (SAC Ex. B [Docket No. 27-2], Article XIV, §IV(A) (emphasis added).)

Also important is Article II of the Hospital's "Fair Hearing Plan,"[4] which delineates various situations that entitle a practitioner to a hearing. Relevantly, it states:

> The following recommendations or actions shall, if deemed adverse
> pursuant to Article III below, entitle the affected Practitioner to a hearing:

---

[3] Defendants do not appear to dispute Plaintiff's contention that the Bylaws created contractual obligations between the Hospital and its medical staff. (*See* Defs.' Br. in Supp. of Mot. to Dismiss [Docket No. 35] at 10 (citing *Berberian v. Lancaster Osteopathic Hospital Assoc.,* 149 A.2d 456, 459 (Pa. 1959); *Lyons v. Saint Vincent Health Center,* 731 A.2d 206, 210 (Pa. Commw. 1999); and *Posner v. Lankenau Hospital,* 645 F. Supp. 1102, 1106 (E.D. Pa. 1986)).

[4] The Fair Hearing Plan is attached as "Exhibit A" to the Bylaws (Docket No 27-2 at 36-42).

iv.     revocation of Medical Staff Membership, *subject to the provisions set forth in … Article XIV of the Medical Staff Bylaws*;

***

ix.     revocation of clinical privileges, *subject to the provisions set forth in … Article XIV… of the Medical Staff Bylaws*…

(Fair Hearing Plan, Bylaws Ex. A [Docket No. 27-2], Article II (A)(iv) and (ix) (emphasis added).)  Article III of the Fair Hearing Plan in turn specifies that:

A recommendation or action listed in Article II above, *shall be deemed adverse action only* when it has been:

A.  recommended by the Medical Executive Committee;

B.  taken by the Board contrary to a favorable recommendation by the Medical Executive Committee under circumstances where no prior right to a hearing existed; or

C.  taken by the Board on its own initiative without benefit of a prior recommendation by the Medical Executive Committee.

(Fair Hearing Plan, Bylaws Ex. A, Article III (emphasis added).)

Pursuant to the foregoing provisions, the Fair Hearing Plan contemplates due process proceedings for certain "adverse" recommendations or actions, but Article XIV, §(IV)(A) of the Bylaws expressly states that an automatic termination of staff membership or clinical privileges resulting from the termination of a physician's contract "shall not be deemed to be an adverse action."   Thus, Defendants argue, the language of the Bylaws is clear that Plaintiff was not entitled to a hearing under the present circumstances because his clinical privileges terminated automatically upon the termination of the Employment Agreement, and this situation is expressly deemed not to be an adverse action.  Moreover, Defendants note, of all the enumerated "recommendations or actions" that can potentially trigger a due process hearing under the Fair Hearing Plan, the ones arguably applicable here – i.e. revocation of medical staff membership

and/or revocation of clinical privileges – are expressly made "subject to the provisions set forth in … Article XIV" of the Bylaws.  Again, however, the relevant Article XIV provision expressly states that an automatic termination of staff membership or clinical privileges resulting from the termination of a physician's contract "shall not be deemed to be an adverse action."  Finally, Article III of the Fair Hearing Plan enumerates the three situations which can render a recommendation or action "adverse," and Defendants accurately point out that Plaintiff has not alleged facts establishing that any of these three situations existed here.

For purposes of Count 1, Plaintiff acknowledges that Defendants were contractually obligated under the Bylaws to **_not_** treat his termination as an adverse action, but he contends this obligation was breached by virtue of Defendants' report to the NPDB.  Here, Plaintiff invokes the provisions of the HCQIA in an attempt to supply meaning to the term "adverse action." Plaintiff argues that "an 'adverse action' for HCQIA reporting purposes is an action affecting a physician's staff membership or clinical privileges for a period greater than thirty (30) days as a result of a **professional review action**."  (Pl.'s Br. in Opp. [Docket No. 37] at 9.)  Thus, Plaintiff considers the term "adverse action" a term of art which is generally understood to mean a limitation on privileges after a peer or professional review action.  (Id. at 10.)  He maintains that the Hospital breached the Bylaws by treating his automatic termination of staff membership and clinical privileges as an "adverse action" for NPDB reporting purposes.

This legal theory is insufficient to state a viable claim for breach of contract.  Because Plaintiff has identified the Bylaws as the operative contractual document, it is the terms of that document which must give rise to the duty allegedly breached.  By contending in Count 1 that Defendant Hospital's report to the NPDB breached the Bylaws, Plaintiff is necessarily suggesting that the Bylaws contractually bound the Hospital _not_ to make its report to the NPDB,

12

but no such term is found in the Bylaws. The Bylaws simply state that (a) clinical privileges and medical staff membership shall terminate immediately and automatically upon termination of the physician's employment contract, and (b) such termination shall not be deemed to be an adverse action. (Bylaws Art. XIV, §(IV)(A).) Plaintiff attempts to read meaning into the term "adverse action" by referring to the HCQIA, but this approach is misguided. For purposes of the Bylaws, the term "adverse action" has consequence only insofar as it triggers due process procedures under the Bylaws' Fair Hearing Plan, and there is no ambiguity in the Bylaws concerning the fact that the automatic and immediate loss of clinical privileges and staff membership which results from a termination of the physician's employment contract (as was the case here) is not an "adverse action" giving rise to due process hearing procedures. In essence, Plaintiff is attempting to graft a contractual obligation onto the Bylaws by reading into them an obligation on the part of the Hospital not to make any report to the NPDB. As Defendants point out in their supplemental brief, however, the Hospital's reporting requirements under the HCQIA are not a matter that could be altered, waived, or otherwise bargained away through a contractual arrangement between the Hospital and a physician. Because Count 1 of the Second Amended Complaint fails to state a viable claim for breach of contract, it will be dismissed.

In Count 2 of the Second Amended Complaint, Plaintiff asserts that Defendant Hospital breached the bylaws by failing to afford him due process procedures "pursuant to a professional review action," including notice of the charges against him, a hearing at which he could contest the charges, and an opportunity to appeal any unfavorable ruling. (SAC ¶ 49.) On this matter, Plaintiff claims, Defendants failed to follow not only the disciplinary procedures and the Fair Hearing Plan set forth in the Bylaws, but also state and federal law. Citing to 28 Pa. Code §§107.12(4) and 107.15, Plaintiff argues that Pennsylvania law requires that physicians be

granted fair hearing and appellate rights prior to any curtailment of staff privileges. (Pl.'s Br. in Opp. [Docket No. 37] at 10-11.) Citing to the Centers for Medicare and Medicaid Services (CMS) State Operations Manual Appendix A – Survey Protocol, Regulations and Interpretive Guidelines for Hospitals §§ 482.11(a)(5) and 482.12(a)(2), Plaintiff contends that a recommendation by medical staff was a prerequisite to the revocation of clinical privileges and medical staff membership. (Id. at 11.)

This alternative breach of contract theory fares no better than Plaintiff's first theory. Despite Plaintiff's insistence that the Bylaws contractually obligated Defendant Hospital to provide the due process measures set forth in the Fair Hearing Plan, the Bylaws expressly exempt the present situation from such measures. As the Court has previously discussed, the automatic and immediate termination of Plaintiff's clinical privileges and medical staff membership is expressly deemed to be non-adverse under Article XIV § (IV)(A) of the Bylaws. Accordingly, Plaintiff's loss of staff membership and clinical privileges cannot be considered an "adverse recommendation or action" entitling him to the procedures outlined in the Fair Hearing Plan. (Fair Hearing Plan, Bylaws Ex. A, Article II(A).) As there is no ambiguity in these provisions, Plaintiff's attempt to infuse meaning into the Bylaws' use of the term "adverse actions" by referencing the HCQIA's definitions is unwarranted. To the extent Plaintiff premises his claim on the Hospital's failure to invoke the disciplinary process outlined in Article XVI of the Bylaws, this theory is likewise untenable. When read in conjunction with the other provisions of the Bylaws and the terms of the Employment Agreement,[5] it is clear that Article XVI has no applicability in situations like the present case where termination of an employment

---

[5] Notably, the Employment Agreement unambiguously states that, "[i]n the event any provisions of this Agreement conflict with the Medical Staff Bylaws, this Agreement shall be controlling and shall supercede the inconsistent provisions of the Medical Staff Bylaws." (SAC Ex. A ¶ 12.)

contract precedes (and thereby automatically triggers) the loss of clinical privileges and medical staff membership. Finally, questions as to whether Defendants violated federal or state law are irrelevant insofar as Plaintiff's breach of contract claims are concerned because the alleged breach must be grounded in a contractually-based legal obligation.

In sum, Plaintiff has failed to state a cognizable claim for breach of contract under Counts 1 and 2 of the Second Amended Complaint. Accordingly, Defendants' motion to dismiss will be granted as to those claims.

### 2. *Defendants' Motion to Dismiss Count 3*

Plaintiff's third cause of action asserts that Defendants breached the covenant of good faith and fair dealing implied in the Employment Agreement. It is undisputed that Plaintiff was terminated pursuant to Section 8(a)(i) of the Employment Agreement, which states that the contract could be terminated "[b]y either party, without cause or consent, upon ninety day's written notice; provided, however, that Hospital may elect, in its sole discretion, to pay Physician in lieu of notice the base salary Physician would have earned had Physician continued to work during the ninety-day notice period." (SAC Ex. A [Docket No. 27-1] § 8(a)(1).) Like Plaintiff's breach of contact claims, Count 3 is premised on the Defendants' allegedly wrongful submission of the Adverse Action Report to the NPDB in the absence of due process measures and after having informed Plaintiff that his termination was on a "non-cause basis." (SAC ¶¶ 53-54.)

The parameters of the "implied covenant of good faith and fair dealing" doctrine were discussed in some detail by the federal district court in *Benchmark Group, Inc. v. Penn Tank Lines, Inc.,* 612 F. Supp. 2d 562 (E.D. Pa. 2009). There, the court explained:

> "In Pennsylvania, a covenant of good faith and fair dealing is implied in every contract." *Temple Univ. Hosp., Inc. v. Group Health, Inc*., Civ. A. No. 05–102, 2006 WL

146426, at *6 (E.D. Pa. Jan. 12, 2006) (*quoting Lyon Fin. Servs. v. Woodlake Imaging, LLC,* Civ. A. No. 04–3334, 2005 WL 331695, at *8 (E.D. Pa. Feb. 9, 2005)). The duty of good faith has been defined as "honesty in fact in the conduct or transaction concerned." Restatement (Second) of Contracts § 205 cmt. a (1981). Examples of bad faith can include "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance." *Somers v. Somers*, 418 Pa. Super. 131, 613 A.2d 1211, 1213 (1992) (quoting Restatement (Second) Of Contracts § 205 cmt. d). Courts use this good faith duty as "an interpretive tool to determine the parties' justifiable expectations in the context of a breach of contract action." *Northview Motors, Inc. v. Chrysler Motors Corp.*, 227 F.3d 78, 91–92 (3d Cir.2000). Although the precise contours of a party's duty under the covenant vary with the context, good faith generally entails "'faithfulness to an agreed common purpose and consistency with the justified expectations of the other party.'" *Curley v. Allstate Ins. Co.*, 289 F.Supp.2d 614, 617 (E.D. Pa.2003) (quoting Restatement (Second) § 205 cmt. a).

Notably, "Pennsylvania law does not ... recognize an independent claim for breach of the implied covenant of good faith and fair dealing." *Lyon*, 2005 WL 331695, at *8. "The duty of good faith is not divorced from the specific clauses of the contract and cannot be used to override an express contractual term." *Northview Motors*, 227 F.3d at 91; *see also Seal v. Riverside Fed. Sav. Bank*, 825 F. Supp. 686, 699 (E.D. Pa.1993) ("[T]he implied duty of good faith cannot defeat a party's express contractual rights by imposing upon that party specific obligations that it is entitled, by express contract, to resist."). Therefore, a party is generally precluded from maintaining separate claims for breach of contract and breach of the covenant of good faith and fair dealing where both causes of action arise out of the same conduct by the defendant. *Northview Motors*, 227 F.3d at 91–92; *Morgan Truck Body, LLC v. Integrated Logistics Solutions, LLC*, Civ. A. No. 07–1225, 2008 WL 746827, at *5 (E.D. Pa. Mar. 20, 2008). As the Third Circuit has explained, "[t]he covenant of good faith and fair dealing involve[s] an implied duty to bring about a condition or to exercise discretion in a reasonable way" so that "implied covenants and any express terms of a contract are necessarily mutually exclusive—one can invoke implied terms only when there are no express terms in the contract relating to the particular issue." *USX Corp. v. Prime Leasing Inc.*, 988 F.2d 433, 438 (3d Cir.1993) (internal quotations omitted) (emphasis in original). "The law will not imply a different contract than that which the parties have expressly adopted." *Hutchison v. Sunbeam Coal Corp.*, 513 Pa. 192, 519 A.2d 385, 388 (1986). Thus, in order to plead a cause of action for breach of the covenant of good faith, whether it is an express or implied covenant, a plaintiff must allege facts to establish that a contract exists or existed, including its essential terms, that defendant failed to comply with the covenant of good faith and fair dealing by breaching a specific duty imposed by the contract *other than the covenant of good faith and fair dealing*, and that resultant damages were incurred by plaintiff. *Sheinman Provisions, Inc. v. Nat'l Deli, LLC*, Civ. A. No. 08–453, 2008 WL 2758029, at *3 (E.D. Pa. Jul. 15, 2008) (emphasis in original).

612 F. Supp. 2d at 583-84.

Here, Plaintiff's claim fails because he has not alleged the breach of a specific duty imposed by the Physician Employment Agreement "other than the covenant of good faith and fair dealing." *Benchmark Group, Inc.*, *supra*, at 584. Importantly, it is undisputed that the Employment Agreement conferred upon the Hospital the express right to terminate the contract at will, "without cause or consent," subject only to a ninety-day notice period or, in the event the Hospital initiated the termination, payment of a 90-day salary equivalent to Plaintiff. (SAC Ex. A at ¶ 8(a)(i).) There is no dispute that the Hospital's notice of termination expressly invoked that provision. (*See* SAC Ex. D.) Thus, as Defendants point out, Defendant Hospital cannot have breached the Employment Agreement by exercising a right specifically conferred by the Agreement. *See Hutchison v. Sunbeam Coal Corp*., 519 A.2d 385, 388 (Pa. 1986) ("The law will not imply a different contract than that which the parties have expressly adopted.").

In pleading Count 3, Plaintiff objects that Defendants "reported the termination of his employment to the Data Bank as if it had occurred after a 'professional review action,' but without providing him with the due process required by federal law before making such a report." (SAC ¶ 53 (citing 42 U.S.C. §§11112(a) and 11151(a).) As Defendants observe, however, Plaintiff appears to be (once again) conflating Defendants' statutory responsibilities and reporting requirements under the HCQIA with its contractual obligations under the Employment Agreement and thereby grafting additional obligations onto the Employment Agreement that do not appear in that document.

In his brief in opposition to the pending motion to dismiss, Plaintiff cites *Mellon Bank, N.A. v. Deluxe Data Sys.,*1997 U.S. Dist. LEXIS 21976 *6 (June 26, 1997), for the proposition that the implied covenant of good faith and fair dealing imposes both an affirmative duty to do

"those things that reason and justice suggest [the parties] should do in order to carry out the purpose of the contract" and a negative duty to "refrain from doing anything that would destroy or injure the other party's right to receive the fruits of the contract."  (Pl.'s Br. in Opp. [Docket No. 37] at 13.)  Plaintiff argues that the alleged facts show that Defendant Hospital breached the implied covenant by (1) injuring his rights to receive the benefits of the contract; and (2) performing dishonestly.  According to Plaintiff, Section 8(a)(1) of the Employment Agreement created the justifiable expectation that, in the event the provision was invoked, no further consequences would ensue and the parties would refrain from further adverse action.  Plaintiff further asserts that the termination notice stating that he was being discharged on a "non-cause basis" was dishonest.

This line of argument is unpersuasive.  Section 8(a)(i) of the Employment Agreement provides that either party could terminate the contract "without cause or consent," subject only to a 90-day advance written notice or payment of the Plaintiff's salary equivalence.  When this provision is viewed in the context of the other bases for termination, it is apparent that the purpose of subsection (a)(i) is to protect each party's right to terminate the contract without any need to explain the reason.  In other words, the purpose of §8(a)(i) is not to guarantee that no cause exists for termination of the contract but, rather, to ensure that each party has the ability to unilaterally terminate the contract without the need to state a cause.  Such circumstances do not foreclose the possibility that the terminating party might have reasons for its decision to invoke §8(a)(i).  Thus, Plaintiff's theory that §8(a)(i) created an expectation on his part that he would never have to defend or justify the loss of his employment or clinical privileges is implausible.

Finally, Defendant has cited authority for the proposition that a claim premised on an alleged breach of the implied covenant will not lie where other remedies for the alleged

18

misconduct exist. *See, e.g., Northview Motors, Inc. v. Chrysler Motors Corp.*, 227 F.3d 78, 91-92 (3d Cir. 2000) ("a party is not entitled to maintain an implied duty of good faith claim where the allegations of bad faith are identical to a claim for relief under an established cause of action"); *Parkway Garage, Inc. v. City of Philadelphia,* 5 F.3d 685, 701-02 (3d Cir. 1993) (plaintiff "could seek relief under an established cause of action, and there is no reason to imply a separate tort for breach of a duty of good faith"); *Mellon Bank, N.A. v. Deluxe Data Systems, Inc.,* 1998 U.S. Dist. LEXIS 21976 at *7-8 (W.D. Pa. June 26, 1997) ("where a plaintiff already has an adequate remedy at law, either in tort or in contract, there is no need to create a separate cause of action for breach of an implied duty of good faith and fair dealing"). To the extent Plaintiff's claim for breach of the implied covenant is premised on the Defendants' submission of the Adverse Action Report to the NPDB, such conduct also forms the basis for Plaintiff's defamation and tortious interference with prospective contractual relationships claims. As the Court's analysis makes clear *infra,* those claims will not be dismissed at this juncture. Consequently, Plaintiff has other potentially viable remedies for the misconduct alleged at Count 3, and his claim for breach of the implied covenant of good faith and fair dealing is therefore deficient on this basis as well.

### 3. *Defendants' Motion to Dismiss Count 9*

Plaintiff's ninth cause of action asserts a claim under Pennsylvania common law for abuse of process under the theory that Defendants' filing of the Adverse Action Report with the NPDB involved the use of a legal process for an improper purpose – namely "to besmirch his

professional reputation."[6] (SAC ¶ 88.) "'Abuse of process' is defined as 'the use of legal process against another primarily to accomplish a purpose for which it is not designed.'" *Shiner v. Moriarty,* 706 A.2d 1228, 1236 (Pa. Super. 1998). As Plaintiff acknowledges, the common law tort of abuse of process involves (1) the use of legal process against the plaintiff; (2) primarily to accomplish a purpose for which it was not intended; and (3) resulting harm to the plaintiff. *Cruz v. Princeton Ins. Co.,* 925 A.2d 853, 856 (Pa. Super. Ct. 2007); *Pellegrino Food Products Co. v. City of Warren,* 136 F. Supp. 2d 391, 407 (W.D. Pa. 2000) (*citing Rosen v. American Bank of Rolla*, 627 A.2d 190, 192 (Pa. Super. Ct. 1993)).

Defendants contend that Plaintiff's allegations are legally insufficient to state a claim inasmuch as Plaintiff has not alleged that Defendants used "legal process" against him. This argument has merit. "The term 'process' has been interpreted in Pennsylvania to encompass all of the procedures incident to the litigation process, including discovery proceedings, the noticing of depositions and the issuing of subpoenas." *Pellegrino Food Product Co.,* 136 F. Supp. 2d at 407 (citing *Rosen v. American Bank of Rolla,* 627 A.2d 190, 192 (1993)). *See also General Refractories Co. v. Fireman's Fund Ins. Co.,* 337 F.3d 297, 310 (3d Cir. 2003) (citing *Pellegrino Food Products Co., supra*); *Long v. Holtry,* 673 F. Supp. 2d 341, 355 (M.D. Pa. 2009) (*citing Rosen, supra*). The filing of the Adverse Action Report in this case does not constitute a use of "legal process" and, therefore, Plaintiff cannot state a viable claim under Count 9.

Notwithstanding this, Plaintiff asserts that the medical staff process and fair hearing and appeals processes provided for by Pennsylvania law, the HCQIA and the Medicare Conditions of Participation are "quasi-judicial" proceedings which must be completed prior to a physician

---

[6] Although Defendants alternatively analyze Plaintiff's claim under the Dragonetti Act, 42 Pa. C.S.A. §§ 8351 *et seq.* (2011), Plaintiff has foresworn any intention to assert a claim under that statute. (*See* Pl.'s Br. in Opp. [Docket No. 37] at p. 17.) Accordingly, the Court need not address the Defendants' Dragonetti Act arguments.

commencing litigation challenging a hospital's decision regarding medical staff membership and clinical privileges. Plaintiff further contends that the filing of a report with the NPDB is a part of the medical staff hearing process, albeit one that is intended to occur only after the medical staff action and a hearing process has been completed. Notably, however, Plaintiff cites no authority – under Pennsylvania or any other jurisdiction for that matter – supporting the proposition that the filing of an adverse report with the NPDB constitutes "legal process" for purposes of an abuse of process claim.[7] Moreover, it is undisputed that the medical staff hearing process was not utilized here and thus, even under Plaintiff's expanded concept of "legal process," no such process occurred here. Accordingly, Defendants' motion will be granted with respect to Count 9.

### 4. Defendants' Motion to Dismiss the Request for Attorney Fees

Finally, Defendants have moved for the dismissal of Plaintiff's general request for attorney fees. "[U]nder the American Rule, applicable in Pennsylvania, a litigant cannot recover counsel fees from an adverse party unless there is express statutory authorization, a clear agreement of the parties, or some other established exception." *Sayler v. Skutches,* 40 A.3d 135, 140 (Pa. Super. Ct. 2012) (*quoting Trizechahn Gateway LLC v. Titus*, 976 A.2d 474, 482–83 (Pa. 2009)). In his original complaint, Plaintiff attempted to plead a cause of action under the Pennsylvania Whistleblower Law, 43 Pa. Stat. Ann. §§ 1421-1428 (West 2013), and, had he prevailed on this claim, he could have sought an award of attorney fees under that statute's express authorization. *See id.* at §1425. However, Plaintiff has since abandoned his

---

[7] Plaintiff cites *Westlake Community Hosp. v. Superior Court*, 17 Cal. 3d 465 (1976) and *Nemazee v. Mt. Sinai Medical Center*, 564 N.E. 2d 477 (Ohio 1990) as examples where courts held that a physician must exhaust his hearing rights prior to seeking legal redress in connection with the loss of medical staff privileges. These cases are inapposite in the context of this civil action and therefore do not support Plaintiff's abuse of process claim.

whistleblower claim. Consequently, there is no express statutory authorization to support an award of attorney fees in this case.

Plaintiff nevertheless maintains that he has properly pleaded a basis for punitive damages and, therefore, a basis for an award of attorney fees. Citing *Nebesho v. Appeal of Brown,* 846 A.2d 721 (Pa. Super. Ct. 2004), Plaintiff posits that Pennsylvania law permits attorney's fees to be granted as a component of a punitive damages award. (Pl.'s Br. in Opp. at 20.) However, the court in *Nebesho* did not expound on this principle or even expressly rule on it. Rather, it appears that both parties in *Nebesho* conceded the point and the court merely accepted that agreement in analyzing whether the record was sufficient to support an award of punitive damages. *See* 846 A.2d at 728 (noting the appellant's "acknowledgment" that punitive damages in the nature of attorney's fees may be granted if there are aggravating circumstances above and beyond those that justified the award of compensatory damages); *id.* at 728 (concluding that the chancellor's award of attorney's fees, "which both parties agree are improper unless such fees are in the nature of punitive damages," could not stand). The only authority discussed by the *Nebesho* Court concerning this principle was *Pittsburgh Live, Inc. v. Servov,* 615 A.2d 438 (Pa. Super. Ct. 1992). However, that case merely articulates the rule that a party "may recover punitive damages if there are aggravating circumstances beyond those that justified the award of compensatory damages," meaning that, in cases of alleged fraud, "there must be acts of malice, vindictiveness and a wholly wanton disregard of the rights of others." *Pittsburgh Live, Inc.,* 615 A.2d at 430. Notably, the court's ruling in *Pittsburgh Live* does not support the principle that attorney's fees may be awarded as a component of punitive damages under Pennsylvania law. On the contrary, the court's decision noted the "well established" rule "that a litigant is responsible for his own counsel fees absent an agreement by the parties or some other

22

established exception" and "there is no established exception which permits recovery of attorney fees in an action for fraud." *Id.* (reversing the lower court's award of attorney fees).

In sum, the rule accepted without discussion in *Nebesho* – that attorney fees can be awarded as a component of punitive damages -- does not appear to be a legal principle recognized under Pennsylvania law. Indeed, it does not appear that any Pennsylvania court has cited or followed *Nebesho* for purposes of applying this rule. Accordingly, Plaintiff has not pleaded a viable basis for attorney fees in light of the claims set forth in the Second Amended Complaint.

### 5. *Defendants' Motion to Dismiss Based Upon the Bylaws' Immunity Clause*

Defendants have alternatively argued that, to the extent the Bylaws have any continuing relevance or viability in this case, some or perhaps all of the claims in the Second Amended Complaint are barred by virtue of the broad immunity clause contained in the Bylaws. The operative language appears at Article XVII of the Bylaws ("Immunity from Liability") as follows:

I. The following shall be express conditions to any Physician['s] … application or reapplication for, or exercise of, clinical privileges or Medical Staff responsibilities at this Hospital:

    A. agrees to maintain continuity of care for his/her patients in the Hospital;

    B. signifies his/her willingness to appear for interviews in regard to his/her application;

    C. authorizes Hospital Representatives… to consult with others who have been associated with him/her and/or who may have information bearing on his/her competence and qualifications;

    D. consents to the inspection by Hospital Representatives of all records and documents that may be material to an evaluation of his/her personal and professional qualifications, … health status pertinent to performance of professional duties … as well as of his/her professional ethical qualifications for Medical Staff Membership;

E.   releases from any liability the Hospital and all Hospital Representatives for their acts performed in connection with this Article XVII;

F.   releases from all liability all individuals and organization who provide information, including otherwise privileged or confidential information, to Hospital Representatives concerning the applicant's ability, professional ethics, character, physical and mental health, emotional stability, and other qualifications for staff appointment and the exercise of clinical privileges; and

G.   agrees that any lawsuit brought by the applicant … shall be brought in a court, federal or state, in the state in which the defendant resides or is located.

H.   [The term "Hospital Representative" is defined].

I.   Such immunity from liability shall apply to all acts, communications, reports, recommendations, or disclosures performed or made in connection with this … institution's activities related and including, but not limited to:

    1.   applications for appointment of clinical privileges and/or Medical Staff Membership;

    2.   periodic reappraisals for reappointment or clinical privileges;

    3.   Governmental Based Actions, Corrective Actions and other disciplinary actions;

    4.   hearings and appellate reviews;

    5.   medical care evaluations;

    6.   utilization reviews;

    7.   other Hospital, Department, Service, or committee activities, related to quality patient care and interprofessional conduct; and

    8.   quality assurance review.

(SAC Ex. B, Article XVII, § I.)

Defendants contend that, if the Bylaws constitute a contract between the parties, then Plaintiff is bound by the immunity provision in Article XVII.  Defendants read that provision as a "comprehensive waiver of any and all claims by Plaintiff that relate in any way to acts, communications, reports, recommendations or disclosures performed or made in connection with

24

the Hospital's activities related to appointment or reappraisals of staff or clinical privileges, corrective actions and disciplinary actions, hearings and appellate reviews, [or] other Hospital or committee activities related to quality patient care and interprofessional conduct." (Defs.' Br. in Supp. of Mot. to Dismiss [Docket No. 35] at 14.)

Plaintiff contends that the immunity provisions are intended to apply only in the context of credentialing decisions and the peer review process, where confidential but candid input from fellow practitioners is meant to be encouraged. Plaintiff argues that Defendants' overly broad interpretation of the clause would essentially transform the Hospital's obligations under the Bylaws into an illusory promise and would make it impossible for the Hospital to be sued, contrary to the parties' intent as manifested by the forum selection clause in §1(G).

Under Pennsylvania law, a release is a contract and release provisions are therefore construed according to the usual rules of contract construction. *Conestoga Ceramic Tile Distributors, Inc. v. Travelers Cas. and Sur. Co. of America*, No. 2085 C.D. 2012, 2013 WL 4508887 at *3 (Pa. Commw. Ct. Aug. 22, 2013) (citations omitted); *A.G. Cullen Construction, Inc. v. State System of Higher Education*, 898 A.2d 1145, 1167 (Pa. Super. Ct. 2006) (citation omitted). "[T]he effect of a release is to be determined by the ordinary meaning of its language." *Taylor v. Solberg*, 566 Pa. 150, 155, 778 A.2d 664, 667 (2001). "If the language of the release is clear, the court looks no further, even if the language is broad or general and no matter how 'improvident' the agreement may later prove to be for one of the parties." *Conestoga Ceramic Tile Distributors, supra*, at *3 (citing *Republic Insurance Co. v. Paul Davis Systems of Pittsburgh South, Inc.*, 670 A.2d 614, 615 (Pa. 1995)). In determining the parties' intent, the language of the release must be viewed in the context of the entire document. *A.G. Cullen Construction, Inc.*, 898 A.2d at 1167-68 (citing *Harrity v. Med. Coll. of Pa. Hosp.*, 653 A.2d 5

(Pa. Super. 1994)).  Each part of the release must be given effect and clauses should be construed as consistent with one another if possible.  *Id.*  If a release is not clear on its face, a court must inquire into the circumstances surrounding its execution in order to discern the intent of the parties and identify those matters "which may be fairly said to have been within the contemplation of the parties when the release was given."  *Id.* at 1168 n. 2 (citations omitted).

Defendants' argument premised upon application of the Bylaws' immunity provision does not supply an appropriate basis for dismissal of Plaintiff's remaining claims at this stage of the proceedings.  As an initial matter, the Court notes that the release from liability pertains to "acts performed [by the Hospital] in connection with … Article XVII," meaning (presumably) the interviewing of applicants who desire staff membership and/or clinical privileges (§ I(B)), the consultation with others who may have information bearing on a physician's competence and qualifications (§ I(C)), and the inspection of documents that may bear on the physician's personal and professional qualifications, health status, and professional ethics (§ I(D)).  None of these types of actions are at issue in this case.  Article XVII also states that the grant of immunity applies to the Hospital's actions and communications related to "applications for appointment of clinical privileges and/or Medical Staff Membership" as well as "periodical reappraisals for reappointment or clinical privileges."  (*See id.* at § I(I)(1) and (2).)  Strictly speaking, however, no such actions are at issue here because Plaintiff's staff membership and clinical privileges terminated automatically upon the termination of his employment contract.  Article XVII further extends the grant of immunity to the Hospital's "acts, communications, reports… or disclosures" undertaken in connection with "activities related to quality patient care and interprofessional conduct" (*id.* at § I(I)(7)); however, the meaning and applicability of this phrase is uncertain in the context of the record now before the Court.  For example, Defendants may ultimately be able

26

to demonstrate their entitlement to immunity by establishing that their actions with regard to Plaintiff's termination and their subsequent report to the NPDB were "activities related to … interprofessional conduct," but the present state of the pleadings does not support such a finding and, thus, further factual development is warranted.  Moreover, even if Defendants can ultimately demonstrate their entitlement to immunity on this basis, it is not presently clear whether the language of §I(I)(7) would apply to, e.g., Defendants' alleged misrepresentations that the Hospital would construct a Cath Lab (for purposes of Count 5) or Defendants' alleged failure to provide employment verification to a prospective employer (for purposes of Count 6).

In sum, although Defendants posit that some or all of their alleged acts of wrongdoing are covered by Article XVII's immunity provision, they fail to elaborate on this point in any detail or assign meaning to the release provision in the context of the Bylaws as a whole.[8]  Given the complexity of the Bylaws, the apparent ambiguity of § I(I)(7), and the parties' failure to analyze the meaning and application of the immunity clause in any depth, this particular basis for dismissal will be denied without prejudice to be raised and addressed, if appropriate, on a more fully developed record.

---

[8] Defendants have cited cases in which courts have upheld and applied broad release language contained in a hospital's bylaws.  *See, e.g., Estate of Blume v. Marian Health Center,* 516 F.3d 705 (8th Cir. 2008); *Deming v. Jackson-Madison County General Hospital District,* 553 F. Supp. 2d 914 (W.D. Tenn. 2008); *Brintley v. St. Mary Mercy Hospital,* No. 09–cv–14014, 2012 WL 5817237 (Nov. 16, 2012).  While these decisions recognize the general validity of broad release language in hospital bylaws, they are of limited value because they are necessarily fact specific and depend upon the release language being analyzed by the courts in those cases.

## IV. CONCLUSION

Based upon the foregoing, Defendants' Motion to Dismiss the Second Amended Complaint (Docket No. 34) is GRANTED insofar as it relates to Counts 1, 2, 3, and 9 as well as Plaintiff's request for attorney fees. In all other respects the motion is DENIED.

An appropriate order follows.


*/s/ Nora Barry Fischer*
Nora Barry Fischer
United States District Judge


Date:          November 22, 2013

CC/ECF:        All Counsel of Record